## THE STATE v. TETTATON, Appellant.

Division Two, January 8, 1901.

1. **Change of Venue:** OPINION OF WITNESSES: NO EXCEPTIONS: TRIAL COURT'S DISCRETION. Defendant having filed a motion for a change of venue on the ground that he could not have a fair and impartial trial because of the prejudice and bias of the inhabitants of the county against him, the opinions of witnesses were taken on the motion; and since the defendant saved no exceptions to such testimony, he must be deemed to have waived the same. While it has been held error to take the opinion of witnesses on such motion, the error will not work a reversal where there is sufficient evidence to support the finding of the court on the issue, and where it is not shown that the trial court abused its discretion in the matter.

2. **Jurors:** VOIR DIRE EXAMINATION. The action of the trial court in requiring counsel to proceed with the *voir dire* examination of the persons summoned as jurors before defendant has announced whether or not he is ready for trial, will not be regarded as error unless defendant is prejudiced thereby.

3. **Continuance:** APPLICATION: DISCRETION. The granting or denial of an application for a continuance is largely discretionary with the trial court, and where the application is based on the ground of the absence of witnesses whose testimony would be merely cumulative or irrelevant, such discretion, in the absence of an evident abuse of it, will not be interfered with.

4. **Testimony:** OF PHYSICIAN: IDENTIFICATION OF BODY. The evidence showed that an entire family, consisting of five persons, were murdered in their home; that the house in which they were at the time of the murder was burned; that on the day after the fire five bodies were found in the ruins; and that none of the family was ever afterwards seen alive. The testimony of the physician as to the condition of the several bodies found in the fire, *held*, proper, as tending to identify, as one of the family, the body of the person for the murder of whom defendant was on trial, and that he came to his death by foul means.

5. ————: OF DEFENDANT AGAINST HIMSELF: EXAMINATION OF WOUNDS. The record showing that it was not only voluntary on defendant's part, but also necessary for the treatment of the wounds, to shave defendant's head, the testimony of witnesses as to the character and condition of wounds on defendant's head after his head was shaved, *held*, competent, and as not compelling defendant to give evidence against himself.

6. ————: VALUELESS: NON-PREJUDICIAL. While evidence as to the actions of defendant at the house of deceased, for a month prior to the alleged homicide, was of little or no value, its admission did not prejudice the rights of defendant, and will not work a reversal.

7. **Evidence:** ADMISSION OF PETITION: MOTIVE FOR CRIME. A member of the deceased family, for the murder of another of whom defendant was indicted, had brought suit in the circuit court against defendant, and had also filed in the probate court a petition for the admeasurement of her homestead in the land of her deceased husband. Defendant was both administrator of the estate, and also an heir thereto, subject to the homestead right of the petitioner and her minor children. The petition in the circuit court tended to show a disagreement between defendant and the petitioner; the petition in the probate court tended to show a motive in the defendant for the commission of the crime, namely, that he might prevent such admeasurement of the homestead, and might himself come at once into possession of the estate. Both petitions were properly admitted in evidence.

8. **Instruction:** "DELIBERATELY:" HOW DEFINED: HARMLESS ERROR. An instruction in a prosecution for murder in the first degree, which employed the word "deliberately," and defined it as meaning "in a cool state of the blood, that is, not in a heat of passion caused by

some just provocation to passion," is criticised as not in accord with the decisions of the Supreme Court, but since there was no evidence of any provocation or heat of passion, error *held*, harmless.

9. ———: VERDICT: RESPONSIBILITY OF JURY. An instruction which told the jury that if they should find the defendant guilty of murder in the first degree, they should simply so state in their verdict, and that they were charged with no responsibility with respect to the punishment for such offense, *held*, proper, as simply telling the jury what the law was, and nothing more.

10. ———: EVIDENCE: DEGREE OF OFFENSE. Where the evidence clearly establishes the mode and manner of the killing, and conclusively shows that the crime committed is either murder in the first degree or nothing, an instruction with respect to any other degree of the crime is not justified, and should not be given.

11. ———: STRIKING OUT: USELESS WORDS. Where the instructions which are given cover every phase of the case, and no others are necessary, words, in instructions requested, which could have no influence on the result of the verdict, but tend only to confuse, are properly stricken out.

12. Murder: FIRST DEGREE: SUFFICIENCY OF EVIDENCE: CASE STATED. The evidence showed that a family of five persons were killed and their bodies burned by the firing of their house after the commission of the crime. Physicians identified the bodies of the deceased, and testified that the member of the family for the murder of whom defendant was being tried, was killed by a shot from a pistol. Neighbors, who went to the burning home, found defendant lying upon the ground, pretending to be unconscious. He claimed to have been wounded by being struck over the head with a pistol at the hands of robbers. The evidence showed that the wounds on defendant's head were not inflicted with a pistol, but with a knife or some sharp instrument. A bloody pocketknife belonging to defendant, was found near him, and empty cartridges and the frame work of a pistol, also belonging to him, were found in the ruins of the fire. It was shown that the defendant had a motive for the commission of the crime, and that no motive could be attributed to any other person. *Held*, that the evidence was sufficient to justify a verdict of guilty of murder in the first degree.

State v. Tettaton.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*J. P. Tribble* and *T. R. R. Ely* for appellant.

(1) The testimony of witnesses as to their opinions regarding the merits of the application for a change of venue was clearly incompetent. It is for the witness to state the facts and for the court to draw conclusions from the facts. State v. Burgess, 78 Mo. 234. These witnesses might have believed all the testimony on the part of the defendant to be true, have known it to be true in fact, and still have believed that he could have a fair trial. The court erred in overruling defendant's application for change of venue. The testimony was clear that there was strong prejudice against the defendant, and no witness for the State testified otherwise. While the granting of a change of venue rests within the sound discretion of the trial court, it is clear that in this case this discretion has been abused. State v. Maddox, 117 Mo. 667. (2) It was error to compel the defendant to proceed with the examination of the jurors on their *voir dire* before the time fixed for the trial of the cause, and before the time at which the defendant was required to plead. (3) The court erred in requiring the defendant to make his challenge from the panel of forty before the time fixed for pleading to the indictment. He should have been allowed twenty-four hours after he announced ready for trial. (4) The court erred in overruling defendant's application for a continuance. The testimony which defendant expected to prove by the absent witnesses was clearly competent on the face of the application; and the developments at the trial show its competency beyond

question, if it was not already apparent.    It was an abuse of discretion on the part of the court in overruling it, and it should work a reversal of the cause.    State v. Maddox, *supra.* (5)  Dr. Harrison was permitted to detail the condition of the various bodies found after the fire, at the place of the alleged homicide.    This should not have been permitted unless he could identify one of them as the body of George Tettaton. It was error for the further reason that it tended to prove other homicides on the part of the defendant.    (6)  John Davis was permitted to testify to the condition of the wounds on defendant's head as they existed after the defendant's head had been shaved; defendant's head was shaved without his consent.    It was involuntary, and was compelling defendant to give testimony against himself.    (7)  It was error to permit witness Esterline to testify to the action of defendant at the house of deceased more than a month prior to the date of the alleged homicide.    It was too remote to throw any light upon the alleged homicide.    It was in no way connected with the crime. It was no part of the *res gestae.*    People v. Henderson, 28 Cal. 465 ; People v. Kalkman, 72 Cal. 212 ; State v. Evans, 65 Mo. 574 ; State v. Ching Ling, 16 Ore. 419 ; State v. Duestrow, 137 Mo. 44 ; State v. Swain, 68 Mo. 605 ; Montag v. People, 141 Ill. 75.    (8)  The court, over the objection of defendant, permitted the witness J. W. Barnett to testify to a conversation had with defendant on the day following the alleged homicide in which the witness detailed a conversation that Mrs. M. J. Tettaton, then deceased, had had with witness some time previous.    This testimony was very injurious to the defendant and was clearly hearsay.    State v. Grote, 109 Mo. 348 ; State v. McCoy, 111 Mo. 517 ; State v. Curtis, 70 Mo. 597 ; State v. Duncan, 116 Mo. 288 ; State v. Duestrow, 137 Mo. 44. (9)  It was erroneous to permit the copy of the petition in the suit of M. J. Tettaton against the defendant to be read to the

jury.   Also the reading of the summons in the case.   They had no probative force whatever, and did not tend to prove the guilt of the defendant.   State v. Kuehner, 93 Mo. 193; State v. Tippett (Iowa), 63 N. W. 811.   (10) The court errred in permitting to be read to the jury the petition of M. J. Tettaton filed in the probate court, to set out her homestead.   It was clearly incompetent.   State v. Kuehner, *supra*.   (11) (a) Instruction 1 given on behalf of the State does not properly define the word "deliberately."   State v. Wieners, 66 Mo. 13; State v. Fairlamb, 121 Mo. 137; State v. Avery, 113 Mo. 475 (495); State v. Ellis, 74 Mo. 207 (219); State v. Lewis, 74 Mo. 222; State v. Talbott, 73 Mo. 347; State v. Sharp, 71 Mo. 218.   (b) It removes from the jury their sense of responsibility of the punishment, and was liable to render them less cautious in their deliberation.   It goes further than any other instruction of like kind ever approved by this court.   No case, heretofore reported, tells the jury that they are "charged with no responsibility with respect to the punishment."   They have been told "that they have nothing to do with fixing the punishment."   State v. Avery, 113 Mo. 475; State v. Howard, 118 Mo. 127.   (12) The verdict of the jury is not supported by the evidence.   There was no proof of the *corpus delicti.*   State v. Dickson, 78 Mo. 438; State v. Jones, 106 Mo. 312; Cole v. State (Ark.), 26 S. W. 377; State v. Smith, 9 Wash. 341.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) Defendant complains that error was committed in passing upon his application for a change of venue in that the witnesses were permitted to testify as to their opinions regarding the merits of the application; that is, some were permitted to testify that they believed defendant could have a fair trial,

while others were permitted to testify that they believed a fair number of jurors could be obtained to try the case.    An examination of the testimony of the various witnesses discloses the fact that no exceptions were saved to the questions put, or answers made, so even though conceding the testimony to be erroneous, yet the defendant can not, at this late day, take advantage thereof, because of his failure to object to such testimony and properly save his exceptions.    The finding of the trial court on the application for a change of venue will not be disturbed, unless the discretion and judgment which is imposed upon that court has been abused.    State v. Thompson, 141 Mo. 408.    (2) The record fails to disclose error on the part of the trial court by compelling the defendant to proceed with the examination of the jurors on their *voir dire* before the time fixed for the trial of the cause, and before the time at which defendant was required to plead.    The defendant was in nowise prejudiced by the actions of the court in this regard. (3) The question of a continuance is a matter resting to a large extent upon the discretion and judgment of the trial court, and unless it appear that the judgment of that court or the discretion to be exercised by him has been abused, the appellate court will not interfere.    State v. DeWitt, 152 Mo. 76; State v. Webster, 152 Mo. 87.    The court committed no error in refusing the application and no prejudice to the defendant resulted therein.    (4) If it should be found, as it was in this case, that all of the persons burned had the appearance of being murdered by the infliction of some mortal wound upon their persons, and that George Tettaton was one of them, then the evidence would be conclusive that he came to his death as a result of a mortal wound inflicted, as shown by the evidence, and charged in the indictment.    (5) It matters not whether the defendant voluntarily or involuntarily permitted his head to be shaved.    The evidence shows the shaving to have been

done for the purpose of enabling the physicians to properly treat the wounds. They could have examined the head and testified to substantially the same facts with reference to the nature of the wound and the character of the instrument used in their infliction without the head being shaved as well as with it.   (6) No error was committed in permitting witness Esterline to testify to the action of defendant at the home of the deceased more than a month prior to the date of the alleged homicide.   It showed intent on the part of the defendant, and as such became a part of the *res gestae*.   It might be said that this evidence partakes of the nature of a threat, and as such becomes competent.   St. Louis v. Dixon, 78 Mo. 439.   (7) The fact that a copy of the petition in the suit of M. J. Tettaton against the defendant was read to the jury, does not constitute reversible error.   This evidence was admissible for the purpose of showing disagreement between the defendant and the deceased, and as such occupied a very important position along with other testimony in the case.   (8) Objection is made to instruction 1 because it tells the jury that they are burdened with no responsibility in respect to the punishment should they find the defendant guilty of murder in the first degree, as that is fixed by law.   This objection is frivolous for the reason that when the court tells the jury that the punishment for murder in the first degree is fixed by law, it is virtually informed that no responsibility rests upon them in regard to it.   Defendant could not possibly have been injured or prejudiced by the court's action in this respect.   (9) The instructions offered by the defendant and modified by the court are not to be criticised.   The defendant was convicted of murder in the first degree.   The circumstances of the case, as shown by the evidence, were such that an instruction on no other degree of murder should have been given, although by the instructions given on behalf of the State the court did in-

struct on the question of murder in the second degree, and defendant can not complain because of his conviction of murder in the first degree.    State v. Fitzgerald, 130 Mo. 407.

BURGESS, J.—The defendant was indicted at the May adjourned term, 1899, of the circuit court of Dunklin county, for the murder of George Tettaton, on the night of the twenty-sixth of April, 1899.    At the October term, following, he was tried and convicted of murder in the first degree and sentenced to be executed.    Defendant appeals.

Mrs. Mary J. Tettaton, the step-mother of the defendant, lived with her four children, George, Ben, Ada and Ida Tettaton, on a farm about one mile and a quarter north of the city of Malden in Dunklin county, Missouri.    The husband of Mrs. Tettaton died a few years since, and the defendant was administrator of his estate.    Defendant is a half brother to the four children named, and the step-son of Mary J. Tettaton. Defendant lived at Bernie, in Stoddard county, a distance of about eight miles from the home of his deceased father, where his step-mother and her children were living.    Prior to the commission of the crime charged in the indictment, there had been some litigation between the defendant and his step-mother, growing out of the affairs of the estate, she obtaining judgment for the sum of five hundred and fifty dollars in satisfaction of her demand.    She had also made application to have a homestead for herself and family set apart, out of the real estate owned by her deceased husband at the time of his death, a petition therefor being filed in the probate court of Dunklin county.

While the relations existing between the defendant and his step-mother were not altogether friendly, yet he continued as administrator of the estate and visited her home on frequent occasions for the purpose of making payments on the judgment which she had obtained.

At about nine o'clock p. m., on the twenty-sixth of April, 1899, Mrs. Tettaton's house was discovered by her neighbors to be on fire, and had gained such headway that no entrance thereto was possible. The defendant was found lying outside of the yard, wounded and. bleeding; he was taken to the home of a farmer near by by the name of J. L. Watts, where physicians were called and his wound treated. As soon as he was able, he stated that he had gone to the home of his step-mother that evening for the purpose of paying her three hundred and fifty dollars, the balance due on the judgment above referred to; that he had made the payment and intended to remain with the family that night; that about nine o'clock his half-brother George was playing the organ while his step-mother was preparing the bed in which he was to sleep; at this point, two men wearing masks entered the room, raised their guns and demanded that they give them their money or throw up their hands; his step-mother attempted to jump out of the south window of the room, and one of the robbers fired and she fell backwards at the defendant's feet. Defendant jumped through the west window of the room in the attempt to get in the south room where he had left his pistol, when he was struck over the head by one of the robbers with a gun; he staggered to the east side of the house and fell. While lying there he heard the shooting in the house. · He got up and attempted to leave the premises and call for help; he passed around the north side of the house and while attempting to go through the west gate, he was struck again by some sort of a weapon and became unconscious. It was shown at the trial that the wounds upon his head were made with some sharp instrument and were not sufficient, according to the opinion of the examining physician, to have rendered him unconscious, although he endeavored to make it appear that he was unconscious when the neighbors who discovered the fire came upon the premises. Defendant's

knife was found lying near him after he had been dragged away from proximity to the fire; it was very bloody. A bloody receipt, dated in March and signed by Mrs. Mary J. Tettaton, was also found near him. Two weeks later a receipt was found in the inner compartment of his pocket book, which defendant claimed to have received that night from his step-mother; this receipt was covered with blood.

The evidence of the physicians disclosed the fact that it would have been impossible for the defendant to have been cut in the head by any other person than himself, as the strokes had the appearance of commencing at the back part and running over to the top and near the forehead. The knife evidently entered the back part first, as the wounds were deeper there than towards the front.

Empty cartridge shells were found among the debris of the burned building; the iron framework of a pistol was also found which the defendant identified as his. Defendant claimed that before supper he had placed his revolver on the bed in one of the rooms near the kitchen, but before doing so had removed all the cartridges and placed them in his vest pocket for fear some of the children might get hold of them and injure themselves. Upon examination, however, it was found that the vest pocket contained no cartridges.

Five bodies were taken from the fire, which were burned beyond recognition, except by persons who were well acquainted with the family and who knew the exact number as well as the sex and age of each. The indictment charges the defendant with the murder of George Tettaton, and the evidence shows beyond question that George came to his death by reason of a bullet from a firearm passing through his skull and into the brain.

Evidence was introduced showing defendant to be a man

of good moral character with unquestioned reputation for honesty, peace and sobriety.

In behalf of the State the court instructed the jury as follows:

"1. The court instructs the jury that if they believe and find from the evidence, beyond a reasonable doubt, as hereinafter defined, that at the county of Dunklin and State of Missouri, on the twenty-fifth day of April, 1899, the defendant James H. Tettaton shot and wounded the deceased, George Tettaton, with a bullet then and there fired from a pistol which he the said James H. Tettaton, then and there held and had, and shall further find and believe that said shot was so fired by the said James H. Tettaton and shall further find and believe that such shooting was done willfully, deliberately, premeditatedly, and with malice aforethought, and if the jury shall further find and believe from the evidence that on the same day, at the county and State aforesaid, the said George Tettaton died in consequence of such shooting and wounding done by the defendant, you will find the defendant guilty of murder in the first degree. As used in the above instructions 'willfully' means intentionally, as distinguished from accidentally. 'Deliberately' means, in the above instruction, in a cool state of blood, that is, not in a heat of passion caused by some just provocation to passion. 'Premeditatedly' means thought of beforehand any length of time however short. 'Malice' does not mean spite or ill will but signifies an unlawful state of mind; such a state of mind as one is in when he intentionally does an unlawful act. 'Malice aforethought' means malice with premeditation, that is, that the unlawful act intentionally done was determined upon before it was executed. If you find the defendant guilty of murder in the first degree you will simply so state in your verdict; you are charged with no responsibility with respect to the punishment for murder in the first degree.

"2.   The court instructs the jury that evidence is of two kinds, direct and circumstantial.   Direct evidence is when a witness testifies directly of his own knowledge of the main fact or facts to be proven, to-wit, that the defendant shot and killed the said George Tettaton, as charged in the indictment.   There is no direct evidence of the defendant's guilt.   Circumstantial evidence is proof of certain facts and circumstances in a certain case from which the jury may infer other and connected facts which usually and reasonably follow, according to the common experience of mankind.   Crime may be proven by circumstantial evidence, as well as by direct testimony of eye witnesses; but the facts and circumstances in evidence in order to justify a conviction, should be consistent with each other and with the guilt of the defendant and inconsistent with any reasonable theory of the defendant's innocence.   If, therefore, the jury believe from the evidence in this case that such facts and circumstances have been proven as to satisfy you beyond a reasonable doubt that the defendant did willfully, deliberately, premeditatedly and of his malice aforethought kill George Tettaton, as defined in the first instruction given herein, the jury are warranted in finding the defendant guilty as charged, though no witness has testified of his own knowledge as to the actual fact of such killing.

"3.   If the jury believe from the evidence that the defendant, James H. Tettaton, made any statement or statements on the night of April 25, 1899, or on the following day, in relation to what occurred at the time and place of the burning of the dwelling of Mrs. M. J. Tettaton, and the fate of her and her family, and of the cause of the injuries received by himself and the manner of the infliction of said injuries, the jury must consider all he said together, and what he said against himself the law presumes to be true because against himself; what he said for himself the jury are not bound to

believe because said in a conversation proved by the State, but they may believe or disbelieve it as shown to be true or false from all the evidence in the case.

"4.   You are further instructed that the burden of proving the defendant guilty beyond a reasonable doubt rests upon the State; and if upon the evidence considered as a whole the jury entertain a reasonable doubt as to the defendant's guilt, you should give him the benefit of such doubt and find him not guilty; but a doubt to authorize an acquittal on that ground alone, should, as stated, be a reasonable doubt, and one fairly arising from the evidence as a whole.; the mere possibility that the defendant may be innocent will not warrant you in acquitting him on the ground of reasonable doubt.

"5.   Under the law the defendant is a competent witness in his own behalf, and you should take his testimony into account and give it such weight as you deem it entitled to receive in passing upon his guilt or innocence.   But in determining what weight you will attach to his testimony, you may take into consideration the fact that he is the defendant in the cause testifying in his own behalf, and his interest in the result of the trial.

"6.   You are the sole judges of the credibility of the witnesses and the weight of their testimony; and if you believe that any witness in the cause has willfully sworn falsely as to any material fact or matter testified to by such witness, you are at liberty to disregard or treat as untrue the whole or any part of the testimony of such witness.

"7.   The court instructs the jury that the guilt of the defendant can not be presumed, but must be proven either by direct or circumstantial evidence, and the court instructs you that there is no direct evidence of the guilt of the defendant in this case.   Before you can convict the defendant on circumstantial evidence alone, the facts and circumstances must all

form a complete chain, and all point to his guilt, and must be irreconcilable with any reasonable theory of his innocence; and before the jury can convict the defendant on circumstantial evidence alone, the circumstances must not only be consistent with his guilt and point directly thereto, but must be absolutely inconsistent with any reasonable theory of his innocence.

"8.   The court instructs the jury that circumstantial evidence should always be cautiously considered and to warrant a conviction it must be such as to produce in the minds of the jury that certainty of guilt that a discreet man would be willing to act upon in his own grave and important concerns. Such evidence is not sufficient for conviction unless it excludes every reasonable theory consistent with the defendant's innocence.   If the jury are not satisfied of the guilt of the defendant beyond a reasonable doubt, the defendant ought to be acquitted, although the unfavorable circumstances, if any, have not been disproven or explained.

"9.   If the jury believe from the evidence beyond a reasonable doubt as defined in these instructions, that defendant shot and killed the deceased as charged in the indictment, then the previous good character of the defendant, upon that ground alone; but in determining the guilt or innocence of the defendant, the evidence of his previous good character should be considered by the jury.

"10.   The court instructs the jury that if they find from the evidence that the State has shown no motive on the part of the defendant to commit the crime charged in the indictment, then the absence of such motive is a circumstance which the jury ought to consider in arriving at their verdict.   But that if they believe from all the evidence beyond a reasonable doubt that the defendant committed the crime charged, they will not be justified in acquitting simply because the State has

failed to show a motive for the crime charged against him."

To the giving of each and every one of the said instructions, the defendant by his counsel then and there excepted.

At the request of the defendant the court gave the following instructions, to-wit:

"1.   The court instructs the jury that the indictment in this case is a mere formal charge and is not of itself any evidence of the defendant's guilt, and no juror should permit himself to be influenced to any extent because of said indictment having been returned by the grand jury.

"2.   The court instructs the jury that in considering the question as to whether or not the defendant is guilty or innocent of the crime imputed to him, the jury should take into consideration and duly weigh, along with the other evidence in the case, the evidence offered by the defendant as to his previous good character as a law-abiding and peaceable person as well as his previous good character for honesty and fair dealing, if such character has been proven."

Defendant then offered and asked for instructions numbered 3, 4, 5, 6, 7 and 9, as follows, to-wit:

"3.   You are further instructed that where the State seeks, as in this case, to convict upon circumstantial evidence only, the inculpatory or criminating facts must, in order to justify a conviction, be not only consistent with his guilt but must be inconsistent with any reasonable hypothesis or theory of his innocence.   And before the jury should convict, they ought to be satisfied from the evidence and facts proven, beyond a reasonable doubt, that his guilt has been so established; and, if not so established, you ought to acquit, *although you may believe the probabilities of his guilt to be greater than the probabilities of his innocence.*

"4.   You are further instructed that the defendant is in law presumed to be innocent until his guilt is established by

Vol. 159 mo—24

such evidence as will exclude every reasonable doubt. It is not enough in a criminal trial, to justify a verdict of guilty, that there may be strong suspicion or even a strong probability of the guilt of the defendant, but the law requires proof by legal and credible evidence of such nature as that, when all considered, it produces a clear conviction of the defendant's guilt beyond a reasonable doubt. So, in this case, if the jury entertain any reasonable doubt of the defendant's guilt, they should acquit him, *or, if any one of the jury, after having considered.all the evidence and after having consulted with his fellow jurymen should entertain such a reasonable doubt, the jury can not in such case find the defendant guilty.*

"5. You are instructed that in passing upon the weight of evidence which is wholly circumstantial, the facts sought to be established by said testimony must flow naturally from the proven or admitted facts and such evidence should be considered by you with great caution because of the fact that the human mind in applying such testimony and drawing inferences therefrom may judge incorrectly. You should act upon circumstantial evidence with the same caution which ordinarily prudent men would use in their own grave and important concerns. And if after hearing all the testimony, both for the State and the defense, you can infer any reasonable theory or hypothesis of the defendant's innocence, you should acquit him, *although there may be stronger probabilities of his guilt than of his innocence, the policy of the law being that it is better that ninety and nine men escape punishment than that one innocent man be punished.*

"6. Before you can convict the defendant you must be convinced by the evidence beyond a reasonable doubt that the body found was the dead body of George Tettaton for whose death this defendant is being tried, and the proof of his identity must be so strong and satisfactory to you as to leave

no reasonable doubt in your mind on that point. *And in this
connection the mere opinions of witnesses are not sufficient to
establish such fact.*

"7.   You are further instructed that before you can con-
vict the defendant of the crime charged against him you must
be satisfied and believe from the evidence beyond a reasonable
doubt that George Tettaton is dead and that he came to his
death by violence inflicted by this defendant under such cir-
cumstances as to constitute murder in the first degree *or mur-
der in the second degree.*   And the proof relating to the death
of the said George Tettaton must include proof clear and con-
vincing of the identity of the body found as being that of
George Tettaton and such proof of identity before you can
convict must be so strong as to leave no reasonable doubt upon
that point.

"8.   No inference of any fact is entitled to credit, which
is itself drawn from premises which are uncertain, and where
circumstantial evidence is alone relied on to establish guilt,
the incriminating circumstances must be proven and not pre-
sumed.   Presumptions, which the jury are required to make,
are not circumstances in proof and can afford no proper foun-
dation for a further presumption where there is no reasonable
connection between the fact or facts out of which the first pre-
sumption arises and the ultimate fact sought to be established.

"9.   Before the jury should convict the defendant they
should be satisfied from the evidence that the State has estab-
lished and proved beyond a reasonable doubt, that George Tet-
taton is dead; that the body found has been fully identified
and proven to be his dead body; that he came to his death by
criminal violence, and that this defendant inflicted the violence
that caused his death in Dunklin county, Missouri, under such
circumstances as to constitute either murder in the first degree
*or murder in the second degree* as defined in other instructions

given, and unless you find and believe from the evidence that the State has so established the defendant's guilt you will acquit him.

"1. If the jury believe from the evidence beyond a reasonable doubt that the State has proven all the facts necessary to prove that defendant did kill George Tettaton, yet if the State has failed to establish the mode and manner of the killing, beyond the fact that he was killed with a deadly weapon, the law presumes the death to have been caused by a wound intentionally inflicted with a deadly weapon, and nothing further appearing, that the offense in such case is murder in the second degree.

"2. The defendant requests the court to give proper instructions to the jury on all points of the law arising in the case and to define the different degrees or grades of crime shown by the testimony and the punishment that may be inflicted for each and all such grades."

To the refusal of the court to give each one of the instructions asked by defendant, and in modifying the third, fourth, fifth, sixth, seventh and eighth, by striking out the words in italics, and then giving them as modified, defendant duly excepts.

I. On the seventeenth day of October, 1899, defendant filed his motion for a change of venue on the ground that he could not have a fair and impartial trial in the county of Dunklin, because of the prejudice and bias of the inhabitants of the county against him. The motion was overruled. During the hearing of this motion, some of the witnesses were permitted to testify over the objection of defendant that they believed that he could have a fair trial in the county, while others were permitted to testify that they believed a fair number of jurors could be obtained to try the cause, and this is assigned for error. But it does not appear from the record

that defendant objected to such testimony, and saved his exceptions, and must be considered as having waived the same. But even if not waived we do not think under the circumstances that the judgment should be reversed upon that ground. While it was held in State v. Burgess, 78 Mo. 234, that it was error to take the opinion of witnesses on a motion for change of venue as to whether the applicant could have a fair trial in the county or not, there being enough evidence to support the finding of the court on that issue the error should not work a reversal. In the case at bar there was evidence tending to show that defendant could get a fair trial in the county, and the court having so found as a fact, that finding will not be disturbed in the absence of a showing that the court abused its discretion. [State v. Thompson, 141 Mo. 408.]

II. On the twenty-eighth day of October, 1899, the sheriff of the county having returned into court a list of jurors from whom a panel of forty jurors qualified to sit in the case were to be selected, and from whose number twelve were to be selected to compose the trial jury, the court over the objection of defendant required counsel for the State and defense to proceed with the *voir dire* examination of the persons summoned as jurors prior to the time at which defendant was to announce whether or not he was ready for trial, and this is assigned for error. While counsel for defendant asserts that the action of the court in this regard was error, he has not suggested or intimated in his brief why it was so, or how defendant was prejudiced thereby. Nor are we able to conceive.

III. On the thirty-first day of October, 1899, defendant presented his application for a continuance of the cause upon the ground of the absence of the following named witnesses: Linn Stark, P. P. Johnson, H. J. Cashion, Jack Gibbons, James Gideon, John Davis, W. E. Davis, and ———— Davis,

his wife, William Lane, and Nannie McKinzie.    The motion was overruled.    Two of these witnesses, viz.:    Jack Gibbons and William Lane, were present and testified on the trial, so as to them no error was committed.

As to the witnesses W. E. Davis, and ———— Davis, his wife, it was not stated in the motion that defendant could not safely proceed to trial without their presence, nor that a subpoena had ever been issued for them, nor that it was even probable that their evidence could be procured by the next term of the court if a continuance be granted, or their attendance at such term.    As to the other absent witnesses, their evidence would have been cumulative merely, or irrelevant.    Besides, it always has been held by this court that whether a case will be continued or not rests largely in the discretion of the court, and unless it is manifest that such discretion has been abused, this court will not interfere (State v. Webster, 152 Mo. 87; State v. Dewitt, 152 Mo. 76), and it does not seem to us that such discretion was unwisely exercised in this instance.

IV.    Dr. Harrison, a witness for the State, was permitted to testify, over the objection of defendant, to the condition of the several bodies found in the fire at the place of the alleged homicide, and defendant claims that the evidence should not have been admitted, because the body of George Tettaton was not identified by the witness, and for the further reason that it tended to prove the commission of other homicides by defendant.

The evidence clearly showed that the Tettaton family consisted of five persons, the mother and four children, all of whom resided together at the place of the homicide, George Tettaton, a boy, being the eldest and largest of the children; that five bodies were found in the ruins the next day after the fire, and none of the family in so far as the record shows, were ever seen alive after that time up to the time of the trial.

Under the circumstances the evidence was entirely proper as tending to identify the body of George Tettaton, that he was one of the family, and that he came to his death by foul means.    It is manifest from the evidence that all of the family were murdered by the infliction of some mortal wound upon their persons, and that the house in which they resided and were at the time they were murdered, was burned for the purpose of concealing the crime.

V.    It is insisted that the court should not have permitted witnesses to testify with respect to the condition of the wounds on defendant's head, as they existed after his head was shaved.    The contention is that the act was involuntary, and was compelling defendant    to give evidence against himself.    But this contention is not borne out by the record, which shows that it was not only voluntary on the part of the defendant, but that it was necessary in order to enable the physicians to treat the wounds.    Even if the shaving of his head had been against his will and consent, there can be no question but that physicians could have examined his head, and then testified to the condition of the wounds, their character, and whether or not done with a sharp or blunt instrument.

VI.    Nor is there merit in the claim that error was committed in permitting the witness Esterline to testify to the action of defendant at the house of deceased, about a month prior to the date of the alleged homicide.    While but little importance could be attached to this evidence, and it might just as well have been excluded, its admission was evidently non-prejudicial, and the judgment should not be reversed upon that ground.

VII.    A witness by the name of Barnett was permitted to testify that the next day after the alleged homicide he had a conversation with defendant in which Barnett detailed a conversation that Mrs. M. J. Tettaton, then deceased, had had

with him, and in which defendant said, that she did not feel kindly towards him on account of some matters growing out of his father's estate.   In the admission of this evidence it is urged that error was committed.   If the defendant had been upon trial for the murder of Mrs. Tettaton we think the evidence would have been admissible as tending to show the existence of unfriendly relations between the defendant and her, and motive for the killing.   And as the homicide of Mrs. Tettaton and George Tettaton was evidently a part of the same tragedy, and for the same purpose, we are inclined to hold that no reversible error was committed in admitting it.

It need only be said in this connection that no error was committed in admitting the evidence of McDaniel, of similar import.

VIII.   Defendant further complains of the action of the court in the admission of evidence showing that empty cartridges were found about the burned building a week or more after the alleged homicide.   The argument is that the finding of the empty cartridges was too remote from the date of the homicide.   This contention we think untenable, and for this reason:   Evidence was adduced showing that the frame or iron work of a revolver containing no cartridges, was found at the place where the house stood, shortly after it was burned, and this evidence was competent for the purpose of showing that the homicide was committed by shooting with a pistol, and when considered in connection with the fact of the finding of the unloaded pistol at or near the same place, where the cartridges were found, tended to sustain the charge in the indictment, that the killing was done with a pistol, and that the one found was the instrument of death.   This being the case, it must follow that no error was committed in permitting to be exhibited to the jury the empty cartridges in question, as tending to show that they were the ones from which the bullets

were fired, that caused the death of the unfortunate victims.

IX.   It was shown on the part of the State that Mrs. Tettaton had sued·defendant in the circuit court of Dunklin county, and the petition and summons were read to the jury. She had also filed in the probate court a petition asking that her homestead be set off in the land of her deceased husband, which he occupied as his homestead at the time of his decease, and this petition was also read to the jury.   Defendant was not only the administrator of his father's estate but he was an heir thereto, subject to the homestead right of the widow, and her minor children, and by·their deaths the title vested at once in him, and the petition in regard to this matter tended to show that defendant may have had a motive in committing the crime in order to prevent the admeasurement of the homestead, in order that he might at once come into its possession.

The petition in the suit in the circuit court was properly admitted in evidence, in connection with the other facts in evidence, as tending to show, in a remote degree, a disagreement between defendant and Mrs. Tettaton, in regard to demands against her husband's estate.

X.   The State's first instruction is criticised on the grounds as claimed, that it does not properly define "deliberately;" that it tells the jury, "that they have nothing to do with fixing the. punishment," and that it assumes that George Tettaton was killed with a bullet.·

With respect to the definition of the word "deliberately," it is in almost the exact words of what was said in State v. Ellis, 74 Mo. 207, to be a correct definition of "deliberately," where, as in the case at bar, there was no evidence of heat of passion. ˙ Here there was no evidence whatever of heat of passion, the only question being the identity of the murderer.   In the case of the State v. Kotovsky, 74 Mo. 247, an instruction which defined deliberately as meaning "in a cool state of the

blood, not that heated state which the law denominates passion; and the passion here meant is not that which comes of no cause, but that, and that only, which is produced by some reasonable provocation," it was said that "the instruction would have been accurately correct, if the defense had relied upon a blow received by the accused from the deceased, but in a case where there is evidence of a just provocation given, which the court holds sufficient to reduce the crime to murder of the second degree, it would be error. As there was no evidence in the case of any such provocation or heat of passion, the error was harmless."

In speaking of the instruction in the case last cited, SHERWOOD, C. J. in State v. Ward, 74 Mo. 253, said: "This instruction is almost identical with that given in the State v. Kotovsky, 74 Mo. 247, and, though not in accord with recent decisions of this court, could not have worked the defendant any hurt, since there was no provocation at all, either lawful or otherwise, nothing of that nature which could reduce the offense from murder in the first degree to some lower grade of homicide. For this reason the error was harmless."

So that, although the instruction in the case in hand is not in accord with the decisions of this court, as there was no evidence whatever of provocation of any kind which reduced the offense from murder in the first degree to any lower grade of crime, the instruction was harmless.

Nor was the instruction erroneous in that it told the jury that they were charged with no responsibility with respect to the punishment, as it was simply telling them what the law is.

With respect to the contention that the instruction assumed that George Tettaton was killed with a bullet, it is not borne out by the record. This question was submitted to the jury in words so plain that no one could but comprehend them,

and it was well warranted by the evidence of the family physician, Dr. A. M. Nix, who testified that he was the family physician of the Tettaton family, was well acquainted with them, who were all females except two, George Tettaton and a brother, that they had a great deal of sickness, and that he was there frequently; that he examined the five bodies found in the ruins of the Tettaton home; that he examined the remains of a boy or male, and found feathers adhering to his body as if from a feather bed, and a wound made from a missile discharged from a firearm right in the top of the head, and from the size of which and the appearance of the body and his acquaintance with the family he was of the opinion that it was George Tettaton. Dr. Harrison testified that the gunshot wound on the head of George Tettaton was sufficient to produce death. Clearly, the evidence fully justified the instruction.

XI. Several others of the State's instructions are challenged upon various grounds, but without any apparent reason therefor. They are in form often approved by this court, and presented the case very fairly to the jury. Defendant has no complaint on this score.

XII. Defendant also contends that there was no proof of the mode or manner of killing, and therefore the first instruction asked by him should have been given, but this contention is answered by the tenth paragraph of this opinion, and is without merit. The killing was either murder in the first degree or nothing, and it would have been error for the court to have instructed upon any other degree of homicide. There was therefore no error in eliminating from the instructions asked by defendant the words in italics with respect to murder in the second degree.

XIII. There was no error in striking out the words in italics in the third, fourth, fifth and sixth instructions asked

by defendant, because they could have only tended to confuse, rather than enlighten the jury.   Besides, the instructions given covered every phase of the case, and none others, or additions to those given, were necessary.

XIV.   A final contention is that there was no proof of the *corpus delicti*, and therefore the verdict of the jury was not authorized by the evidence.   But the facts connected with the homicide establish the death of George Tettaton, beyond any reasonable doubt, and no one after a careful perusal of this record can come to any other conclusion than that defendant murdered him by shooting him in the head, while he was lying in bed, and then after having murdered the whole family fired the building in order to conceal his crime.   No one else seems to have had a motive to commit the crime, while the evidence showed that defendant had.   The family physician identified the body of the deceased, George Tettaton, and another physician testified that the shot in the top of his head must have been fatal, and the facts show beyond peradventure that defendant fired it.   Then there are his previous actions towards his stepmother, the litigation that had been pending between them, and the fact that a few nights before the offense was committed defendant at a late hour of night went to the house of Mrs. Tettaton for the purpose of staying all night and upon finding another person there, not a member of the family, stated that he had better go on home, that his little boy was sick. Then, while all of the members of the family came to their deaths by reason of gunshot wounds, the defendant does not pretend that he was fired or attempted to be fired at, but claims that after he escaped from the murderers by jumping through a window of the house, he was assaulted by them with a pistol, knocked unconscious, and his head lacerated and bruised, while the evidence *showed* that the wounds upon his head were not inflicted by a blunt instrument, but were inflicted with a knife

·or some sharp instrument. When the neighbors went to the burning home they found defendant lying upon the ground near the burning building, pretending to be unconscious,, and after he had been removed a short distance from the fire his pocket knife was found near him with blood upon it. A bloody receipt, which he had taken from Mrs. Tettaton, was also found near him. Two weeks thereafter a receipt was found in his pocketbook with blood upon it also, which he claimed to have received that night from his step-mother. These facts conclusively show that defendant inflicted the wounds upon his own head, with his own knife. Besides, the frame work of defendant's pistol was found in the debris, and, a few days thereafter, empty cartridges were found near the same place. These facts, aside from other criminating circumstances in evidence which we have not stated in detail, show conclusively that George Tettaton was shot and killed, and point as conclusively and unerringly to the guilt of defendant as does the needle to the pole.

We therefore affirm the judgment and direct the sentence of the court to be executed.

*Gantt, P. J.*, and *Sherwood, J.*, concur.